UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

TIME INC., HEARST CORPORATION, ADVANCE       :
MAGAZINE PUBLISHERS INC., AMERICAN           :
MEDIA, INC., HACHETTE FILIPACCHI MEDIA       :
U.S., INC., THE McGRAW-HILL COMPANIES,       :
INC., NEWSWEEK, INC., SOURCE INTERLINK       :
MAGAZINES, LLC, REED BUSINESS               :      08 Civ. 7392 (WHP)
INFORMATION, A DIVISION OF REED              :
ELSEVIER INC., VARIETY, INC., REED           :      ECF CASE
ELSEVIER PROPERTIES INC., BONNIER            :
CORPORATION, ZIFF DAVIS PUBLISHING           :
HOLDINGS INC., FORBES LLC, REIMAN MEDIA      :
GROUP, INC., RD LARGE EDITION, INC., HOME    :
SERVICE PUBLICATIONS, INC. and READER'S      :
DIGEST LATINOAMERICA SA,                     :
                                             :
                Plaintiffs,                  :
                                             :
        - against -                          :
                                             :
DARREN ANDREW BUDD, SALVEO LIMITED,          :
CYBERNET COMMUNICATIONS, INC.,               :
SWITCHWORKS TECHNOLOGIES, INC.,              :
HAMIDULLA GHUMAL ABBAS, YOAV                 :
SCHWARTZ, RICK ROSS and JOHN DOES 1-20,      :
                                             :
                Defendants.                  :
------------------------------------------------------------------ x


## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER,
## PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY



**DAVIS WRIGHT TREMAINE LLP**
**1633 Broadway**
**New York, New York  10019**
**(212) 489-8230**

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

I.      THE STANDARD ON PRELIMINARY INJUNCTION ................................. 5

II.     ARGUMENT ................................................................................................ 6

     A.     Likelihood of Success on the Merits ................................................ 6

          1.     Copyright Infringement ...................................................... 6

               a.     Plaintiffs Hold the Necessary Copyright Interests ........................... 7

               b.     Defendants Are Direct Infringers ...................................... 8

               c.     Defendants Are Secondarily Liable for the Acts of Mygazines.com Users ................................................. 16

               d.     Defendants Cannot Claim the "Safe Harbor" of the DMCA ........ 19

          2.     Trademark Claims ............................................................... 21

               a.     Trademark Infringement and Unfair Competition ........................ 21

               b.     False Advertising ............................................................... 25

               c.     Trademark Dilution ............................................................ 25

     B.     Irreparable Harm ............................................................................. 29

     C.     The Balance of Hardships Weigh in Favor of Injunctive Relief ........... 32

III.    SCOPE OF THE INJUNCTION SOUGHT ................................................ 34

CONCLUSION .................................................................................................... 36

## TABLE OF AUTHORITIES

### CASES

**Page(s)**

*ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60 (2d Cir. 1996)..................................30

*Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538,
    399 N.Y.S.2d 628 (1977)..........................................................................26

*American Cyanamid Co. v. Campagna Per Le Farmacie In Italia S.P.A.*,
    847 F.2d 53 (2d Cir. 1988).......................................................................30

*American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994)..................................11

*American Telegraph & Telegraph Co. v. Winback & Conserve Program*,
    42 F.3d 1421 (3d Cir. 1994).....................................................................29

*Armstrong v. Virgin Records, Ltd.*, 91 F. Supp.2d 628 (S.D.N.Y. 2000) ..................................11

*Atari, inc. v. American Philips Consumer Electronics Corp.*, 672 F.2d 607 (7th Cir. 1982)........33

*Bantam Books, Inc. & Louis Amour v. Caroll & Graf Publishers, Inc.*,
    12 Media L. Rep. 2326 (S.D.N.Y. May 28, 1986)..............................................33

*Bourne v. Walt Disney Co.*, 68 F.3d 621 (2d Cir. 1995)....................................................12

*Brown v. It's Entertainment, Inc.*, 34 F. Supp.2d 854 (E.D.N.Y. 1999) ..................................27

*Capitol Records, Inc. v. Wings Digital Corp.*, 218 F. Supp.2d 280 (E.D.N.Y. 2002)...................19

*Cartier v. Aaron Faber, Inc.*, 512 F. Supp.2d 165 (S.D.N.Y. 2007) ......................................24

*Cartier v. Symbolix, Inc.*, 386 F. Supp.2d 354 (S.D.N.Y. 2005) ..........................................24

*Cartoon Network LP v. CSC Holdings, Inc.*, 2008 WL 2952614 (2d Cir. Aug. 4, 2008) .............13

*Citigroup Inc. v. City Holding Co.*, 97 F. Supp.2d 549 (S.D.N.Y. 2000).................................10

*Clinique Laboratories, Inc. v. Dep Corp.*, 945 F. Supp. 547 (S.D.N.Y. 1996) ..........................27

*In re Cooper*, 254 F.2d 611, 614-615 (CCPA 1958) .......................................................23

*Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp.2d 296 (S.D.N.Y. 2007) ..............26, 27

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S. Ct. 2041 (2003)....22, 23

*Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39 (2d Cir. 1994) ..........................................26

# CASES (Cont'd)

**Page(s)**

*Eden Toys, Inc. v. Floralee Undergarment Co., Inc.*, 697 F.2d 27 (2d Cir. 1982)..........................5

*Energy Brands Inc. v. Spiritual Brands, Inc.*, 2008 WL 274276 (S.D.N.Y. July 16, 2008) .........10

*Feist Publ'ns v. Rural Telegraph Service Co.*, 499 U.S. 340 (1991) ..........................................6, 14

*Fisher-Price, Inc. v. Well-Made Toy Manufacturing Corp.*, 25 F.3d 119 (2d Cir. 1994) .............30

*Frank's Rest, Inc. v. Lauramar Enterprises, Inc.*, 273 A.D.2d 349,
    711 N.Y.S.2d 433 (2d Dep't. 2000).....................................................................................21

*Friendly Publs. v. Creative Handbook Services*, 79 Civ. 2758 (S.D.N.Y. Oct. 24, 1979)...........30

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*,
    443 F.2d 1159 (2d Cir. 1971)..............................................................................................16

*Getaped.com, Inc. v. Cangemi*, 188 F. Supp.2d 401 (S.D.N.Y. 2002)...........................................13

*Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp.2d 284 (S.D.N.Y. 2003)...............24

*Harper & Row, Publishers, Inc. v. National Enterprises*,
    471 U.S. 539, 105 S. Ct. 2218 (1985)..................................................................................6

*Henegan Construction Co., Inc. v. Heneghan Contracting Corp.*,
    2002 U.S. Dist. LEXIS 10545 (S.D.N.Y. May 31, 2002).....................................................21

*Herbko Intern., Inc. v. Kappa Books, Inc.*, 308 F.3d 1156 (Fed. Cir. 2002) ...............................23

*Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998)..............................................11

*Jews for Jesus v. Brodsky*, 993 F. Supp. 282 (D.N.J. 1998) .........................................................33

*Kegan v. Apple Computer Inc.*, 42 U.S.P.Q.2d 1053, 1996 WL 667808
    (N.D.Ill. Nov. 15, 1996)......................................................................................................29

*King v. Innovation Books*, 976 F.2d 824 (2d Cir. 1992)..................................................................5

*Kraft General Foods v. Allied Old English*, 831 F. Supp. 123 (S.D.N.Y. 1993) .........................32

*Laureyssens v. Idea Group, Inc.*, 964 F.2d 131 (2d Cir. 1992) .......................................................8

*In re Literary Works in Electronic Databases Copyright Litigation*,
    509 F.3d 116 (2d Cir. 2007)..........................................................................................34, 35

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108 (2d Cir. 2006).........................22

### CASES (Cont'd)

Page(s)

*McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544 (2d Cir. 1991)..........................25

*Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026 (2d Cir. 1989) ......26

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94 (2d Cir. 2002) .......30

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*, 545 U.S. 913,
    125 S. Ct. 2764 (2005)....................................................................................................16, 17, 30

*Microsoft Corp. v. Harmony Computers & Electricals, Inc.*,
    846 F. Supp. 208 (E.D.N.Y. 1994) ...............................................................................................6

*My-T Fine Corp. v. Samuels*, 69 F.2d 76 (2d. Cir. 1934) ...........................................................34

*Nabisco Inc. v. P.F. Brands, Inc.*, 191 F.3d 208 (2d Cir. 1999)..................................................26

*Napa Valley Publishing Co. v. City of Calistoga*, 225 F. Supp.2d 1176 (N.D.Cal. 2002) ...........32

*National Football League v. Miller*, 2000 WL 335566 (S.D.N.Y. Mar. 30, 2000)......................10

*National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10 (2d Cir. 2000)..............13

*National Geographic Soc'y v. Condé Nast Publications Inc.*,
    687 F. Supp. 106 (S.D.N.Y. 1988) ..............................................................................................21

*New Kayak Pool Corp. v. R&P Pools, Inc.*, 246 F.3d 183 (2d Cir. 2001) ...................................30

*N. Y. State Soc'y Of Certified Pub. Accountants v. Eric Louis Assoc., Inc.*,
    79 F. Supp. 2d 331 (S.D.N.Y. 1999)............................................................................................27

*New York Stock Exchange, Inc. v. New York, New York Hotel LLC*,
    293 F.3d 550 (2d Cir. 2002)........................................................................................................27

*New York Times Co. v. Tasini*, 533 U.S. 483, 121 S. Ct. 2381 (2000) ........................................7

*Nora Beverages, Inc. v. The Perrier Group of America, Inc.*, 269 F.3d 114 (2d Cir. 2001).........21

*Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345 (8th Cir. 1994)..........................................34, 35

*Opticians Assoc'n of America v. Independent Opticians of America*,
    920 F.2d 187 (3d Cir. 1990).......................................................................................................33

*Pacific and Southern Co v. Duncan*, 744 F.2d 1490 (11th Cir 1984)..........................................34

*Peer International Corp. v. Luna Records, Inc.*, 887 F. Supp. 560 (S.D.N.Y. 1995) ...................19

# CASES (Cont'd)

Page(s)

*Pem-America, Inc. v. Sunham Home Fashions, LLC*, 83 Fed.Appx. 369 (2d Cir. 2003)...............5

*Penn. Motor Truck Assoc'n v. Port of Philadelphia Marine Terminal Assoc'n*,
    276 F.2d 931 (3d Cir. 1960).......................................................................................6

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ......................................13, 14

*Philip Morris USA Inc. v. Felizardo*, 2004 WL 1375277 (S.D.N.Y. June 18, 2004)....................24

*Polaroid Corp. v. Polarad Electricals Corp.*, 287 F.2d 492 (2d Cir. 1961)................................24

*R.J.R. Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058 (2d Cir. 1979) ........................................30

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989)........................................................................23

*S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232 (2d Cir. 2001)........................................25

*Salerno v. City University of N.Y.*, 191 F. Supp.2d 352 (S.D.N.Y. 2001) ..................................7

*Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037 (2d Cir. 1980)................................21

*Savin Corp. v. Savin Group*, 2003 U.S. Dist. LEXIS 19220 (S.D.N.Y. Oct. 24, 2003)...............22

*Shady Records, Inc. v. Source Enterprises, Inc.*, 2005 WL 14920 (S.D.N.Y. Jan. 3, 2005).........19

*Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963) ..................................18

*Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*,
    118 F.3d 955 (2d Cir. 1997).......................................................................................18

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S. Ct. 774 (1984)......16

*Steinway, Inc. v. Ashley*, 2002 WL 122929 (S.D.N.Y. Jan. 29, 2002) .........................................29

*Subafilms, Ltd. v. MGM-Pathe Communications*, 24 F.3d 1088 (9th Cir. 1994) .........................11

*The Deal v. Kornagy Publ., Inc.*, 309 F. Supp.2d 512 (S.D.N.Y. 2004) ......................................22

*Time Inc. v. Globe Communications Corp.*, 712 F. Supp. 1103 (S.D.N.Y. 1989)........................21

*Time, Inc. v. Petersen Publ Co. LLC*, 173 F.3d 113 (2d Cir. 1999) ...........................................21

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir. 1995)...............31

*Twentieth Century Fox Film Corp. v. iCraveTV*, 2000 WL 255989 (W.D.Pa. Feb. 8, 2000).......11

## CASES (Cont'd)

Page(s)

*Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*, 996 F.2d 1366 ( 2d Cir. 1993) .........15

*U-Neek, Inc. v. Wal-Mart Stores, Inc.*, 147 F. Supp.2d 158 (S.D.N.Y. 2001)................................7

*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*,
    216 F. Supp.2d 198 (S.D.N.Y. 2002)...............................................................11

*Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141 (2d Cir. 2003) ....................................21

*W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567 (2d Cir. 1993)...................................26

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 120 S. Ct. 1339 (2000) .............22

*Warner Brothers Entertainment Inc. v. Ideal World Direct*,
    516 F. Supp.2d 261 (S.D.N.Y. 2007)...............................................................16

*Well-Made Toy Manufacturing Corp. v. Goffa Intern. Corp.*,
    210 F. Supp.2d 147 (E.D.N.Y. 2002) ...............................................................7

*William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 44 S. Ct. 615 (1924) .......................29

*Yash Raj Films (USA), Inc. v. Bobby Music Co. & Sporting Goods, Inc.*,
    2006 WL 2853874 (E.D.N.Y. Sep. 29, 2006)......................................................19

## Statutes and Rules

15 U.S.C. § 1057(b)...............................................................................22

15 U.S.C. § 1114(1) ................................................................................21

15 U.S.C. § 1121 ...................................................................................6

15 U.S.C. § 1125(a) ...........................................................................6, 21, 25

15 U.S.C. § 1125(c) ...........................................................................6, 26, 27

15 U.S.C. § 1125(c)(2)(A) ...........................................................................27

15 U.S.C. § 1127 ..................................................................................25

17 U.S.C. § 101 ..........................................................................6, 7, 13, 14, 15

17 U.S.C. § 102(a) ..................................................................................7

17 U.S.C. § 106 ..................................................................................6, 12

## Statutes and Rules (Cont'd)

**Page(s)**

17 U.S.C. § 109.................................................................................................12

17 U.S.C. § 201(c) ..............................................................................................7

17 U.S.C. § 410(c) ..............................................................................................7

17 U.S.C. § 410(d) ..............................................................................................8

17 U.S.C. § 411(a) ............................................................................................35

17 U.S.C. § 502(a) ............................................................................................35

17 U.S.C. § 512(c) ............................................................................................20

CPLR § 302(a) ..................................................................................................10

F. R. Civ. P. § 65.................................................................................................1

N.Y. Gen. Bus. Law. § 360-1 (McKinney's 2008).........................................26

## Other Authorities

*McCarthy on Trademarks*, § 25:21.25 at 25-58 (Vol. 4 2008) ........................29

*Nimmer on Copyright,* § 8.09[A].......................................................................7

*Nimmer on Copyright,* § 8.20[A].....................................................................13

This memorandum of law is submitted by plaintiffs Time Inc., Hearst Corporation, Advance Magazine Publishers Inc. d/b/a Condé Nast Publications, American Media, Inc., Hachette Filipacchi Media U.S., Inc., The McGraw-Hill Companies, Inc., Newsweek, Inc., Source Interlink Magazines, LLC, Reed Business Information, a division of Reed Elsevier Inc., Variety, Inc., Reed Elsevier Properties Inc., Bonnier Corporation, Ziff Davis Publishing Holdings Inc., Forbes LLC, Reiman Media Group, Inc., RD Large Edition, Inc., Home Service Publications, Inc. and Reader's Digest Latinoamerica SA (collectively, the "Publishers") in support of their application, by order to show cause, for a temporary restraining order and preliminary injunction pursuant to F.R.Civ.P., Rule 65, enjoining and restraining defendants Darren Andrew Budd ("Budd"), Salveo Limited ("Salveo"), Cybernet Communications, Inc. ("Cybernet"), Switchworks Technologies, Inc. ("Switchworks"), Hamidulla Ghumal Abbas ("Abbas"), Yoav Schwartz ("Schwartz"), Rick Ross ("Ross") and John Does 1-20 (collectively, "Defendants") from (1) reproducing, uploading, posting, displaying, distributing or creating derivative works from plaintiffs' copyrighted magazine content in the United States; (2) inducing, causing, materially contributing to, or receiving a direct financial benefit from, the reproduction, uploading, posting, display, distribution or creation of derivative works from plaintiffs' copyrighted magazine content by others in the United States; and (3) using any trademark or trade dress that is likely to be confusingly similar to, or dilutive of, any of plaintiffs' trademarks or service marks or trade dress, in a way that is likely to have an impact on interstate commerce.

Plaintiffs are the publishers of many of the most recognized general interest magazines in the world, including but not limited to *Time, Entertainment Weekly, Fortune, People, Sports Illustrated, Cosmopolitan, Esquire, Good Housekeeping, Harper's Bazaar, Redbook, Condé Nast Traveler, Vogue, Vanity Fair, The New Yorker, Architectural Digest, Men's Fitness, National Enquirer, Shape, Star, Globe, Elle, Car and Driver, Popular Photography, Road & Track, BusinessWeek, Architectural Record, Newsweek, Arthur Frommer's Budget Travel, Motor*

*Trend*, *Soap Opera Weekly*, *Soap Opera Digest*, *Automobile*, *Interior Design*, *Variety*, *Popular Science*, *Parenting*, *Saveur* and *Outdoor Life*. They hold copyright interests in each of their respective magazines,[1] as well as federal and/or common law trademark and trade dress rights in the names and cover layouts of those magazines. Plaintiffs seek immediate injunctive relief to put a halt to the blatant, willful and wholesale infringement perpetrated by defendants Budd and Salveo[2] through a website known as Mygazines.com (the "Infringing Website" or "Site"), in which web hosts Cybernet and Switchworks and their owner Ross, and web designers Abbas and Schwartz, are active participants.

In sum, defendants are reproducing, distributing and displaying on the Infringing Website unauthorized counterfeit copies of over 450 issues of different magazines owned and published by plaintiffs and offering them for free, in clear violation of the United States copyright and trademark laws. The Infringing Website induces, and/or its owners and operators are vicariously liable for, infringement by third party users in the United States who are encouraged to "upload" copyrighted content to the Infringing Website; "share" that content with others; "archive" that content; and to create derivative works that combine content from multiple publishers. Defendants' slogan leaves no doubt as to the nature of the entire endeavor: directly under the "Mygazines" logo on the Infringing Website and in advertising and promotion for the Website, they exhort "**UPLOAD. SHARE. ARCHIVE.**"

The scope and audacity of defendants' infringing acts is breathtaking: defendants have uploaded approximately 1300 recent issues of all of the most popular magazines published in the United States and Canada, offering them for free to all who visit the Infringing Website. While the site purports to allow visitors to upload their own scanned magazines, the vast majority of the

---

[1] As detailed below, plaintiffs have applied for, on an expedited basis (and in most cases, obtained), registrations for most of the magazine issues posted on the Infringing Website. Because of the continuing threat of infringement and the time-sensitive nature of the magazine content at issue, plaintiffs also seek to enjoin future copyrighted content as more fully addressed *infra* at Point III.

[2] The www.mygazines.com domain name is owned by defendant Salveo.

magazines currently available on the site appear to have been scanned and uploaded by defendants themselves. Unlike some websites that solicit a variety of user-generated content, the Infringing Website exhorts users to upload magazine content that has been copyrighted and published by others. In other words, the Infringing Website appears to have virtually no non-infringing content; rather, its entire aim and purpose appears to be the illegal posting of copyrighted magazine content.

The Site also allows for individual articles within different magazines from different publishers to be clipped and recompiled into derivative "mygazines" by users, and those "mygazines" may be shared with friends and are available to the public at large. The names and full covers of plaintiffs' magazines are used to guide users throughout the Infringing Website. The top of the home page features a revolving, virtual "news rack" displaying a changing assortment of magazine covers, including many of the plaintiffs' respective Magazine covers; clicking on those covers leads to web pages within the site dedicated to each magazine issue.

Plaintiffs are U.S. publishing companies whose sales of magazines, through subscriptions, newsstands, book stores and online partners form the very heart of their businesses. Additionally, the Publishers have developed strong brand identities in association with their respective magazines that allow them to market other products and services under those brands. By usurping plaintiffs' magazine content in its entirety, as well as using plaintiffs' brands to reach consumers for their own purposes, defendants are targeting the heart of plaintiffs' businesses, damaging the substantial good will that plaintiffs that have invested substantial time, effort, advertising and promotion to develop over many years, and indeed are attempting to subvert the industry's fundamental business model. Defendants' actions threaten a broad-reaching impact on U.S. commerce, because their Infringing Website is aimed towards and reaches U.S. consumers, and because they are actively encouraging U.S. consumers to participate in infringing behavior.

Although defendants have not taken the necessary steps to qualify for the "safe harbor" for internet service providers under the Digital Millennium Copyright Act ("DMCA"), plaintiffs

have nevertheless sent cease and desist letters and DMCA take-down notices not only to the mygazines.com domain name owner, defendant Salveo, but also to two domain name server hosts and five web hosts, variously located in the Bahamas, Hong Kong, Russia and Sweden. When one server or web host agreed to terminate its services for the Infringing Website in response to plaintiffs' demands, defendants simply migrated the Site's content to new servers or hosts. Many of the hosts have never responded to plaintiffs' demands. One of the hosts, "PRQ", was described by *The New York Times* as "the world's least lawyer-friendly hosting company". The Infringing Website now appears to be switching regularly between PRQ and defendant Cybernet, in a calculated effort to evade plaintiffs' demands and detection.

Despite those avoidance tactics, plaintiffs have been successful in unearthing at least some of the defendants' hidden identities. The only names publicly identified with the Infringing Website are "John Smith" and "Salveo Limited", listed in the WHOIS information for the mygazines.com domain name. The Infringing Website lists no information about its ownership or the physical location of its business operations, and the email addresses listed on the site are not active. Nonetheless, plaintiffs have now discovered the identity of several individuals actively involved in running the Infringing Website. First, they learned that the original registrant for the domain name is one "Darren Budd". Plaintiffs then discovered that a "Darren Andrew Budd" of 21 Mayfair Avenue, Toronto, Canada, has applied to register the word mark MYGAZINES with the United States Patent & Trademark Office. Next, they learned that a person posting under the name "Darren Budd" has made numerous postings on various Facebook pages promoting the Infringing Website, including postings that use some plaintiffs' magazine covers and trademarks to advertise that Site.

Plaintiffs have also learned that Cybernet and Switchworks are the primary hosts for all of the infringing content on the Site, and their refusal to respond to numerous demands confirms their complicity. Defendant Ross, who owns both Cybernet and Switchworks, is known as a backer of Internet ventures, and appears to have provided financial and business support for the

Site. Finally, plaintiffs' forensic investigators have been able to determine that defendants Abbas and Schwartz are contributing to the Infringing Website as web designers.

Having discovered the identities of some of the wrong-doers, plaintiffs now seek to enjoin them from the irreparable harm that is the inevitable – and intended – result of their conduct.[3] As explained more fully below and in the accompanying affidavits and declarations,[4] plaintiffs therefore require emergency injunctive relief, both a temporary restraining order and preliminary injunction, to halt this major encroachment upon their entire business model and to bring defendants before this Court, before they have an opportunity to migrate the infringing content on the Infringing Website to yet another server in another jurisdiction.

## I.

## THE STANDARD ON PRELIMINARY INJUNCTION

To obtain a temporary restraining order or a preliminary injunction, plaintiffs must demonstrate: (1) irreparable harm which would result from denial of the relief (presumed in copyright and trademark cases in this Circuit); and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to create fair grounds for litigation and a balance of hardships tipping in the movant's favor. *Pem-America, Inc. v. Sunham Home Fashions, LLC,* 83 Fed.App. 369, 370 (2d Cir. 2003); *King v. Innovation Books*, 976 F.2d 824, 828 (2d Cir. 1992).

To protect their rights in the interim, plaintiffs also seek a temporary restraining order requiring defendants to remove all of plaintiffs' magazine content from the Infringing Website. Grant of such an order will serve the central and necessary purpose of preserving the status quo until a decision is reached on the merits. *See Eden Toys, Inc. v. Floralee Undergarment Co., Inc.,* 697 F.2d 27 (2d Cir. 1982); *Pennsylvania Motor Truck Assoc. v. Port of Philadelphia Marine*

---

[3] As set forth in the accompanying Declaration of Lacy H. Koonce, III, sworn to August 20, 2009 ("Koonce Decl."), plaintiffs are seeking complementary relief from the courts in Canada.

[4] Hereinafter, affidavits will be referred to as "Aff't" and declarations will be referred to as "Decl."

*Terminal Association*, 276 F.2d 931 (3d Cir. 1960) (temporary restraining order properly issued to maintain status quo). Without such relief, defendants will continue to offer the infringing materials to the public, and even more importantly, may take further steps to transfer or disguise their ownership of the Infringing Website, and their role in the uploading and conversion of scanned magazines, before the Court can hold a hearing and issue an order on the instant application.

**II.**

**ARGUMENT**

**A.    Likelihood of Success on the Merits**

Plaintiffs have pleaded claims for, *inter alia*, violation of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act"), Sections 32, 43(a) and (c) of the Lanham Act, 15 U.S.C. §§ 1121, 1125(a) and (c) (the "Lanham Act"), and common law unfair competition, trademark infringement, and dilution. For the reasons discussed below, plaintiffs have more than amply satisfied their burden under the applicable standards for each such claim.

**1.    Copyright Infringement**

To establish a claim for copyright infringement under the Copyright Act, the Publishers must demonstrate ownership of valid copyright interests in the allegedly infringed works, and copying of those works by defendants. *Feist Publ'ns v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296 (1991); *Harper & Row, Publishers, Inc. v. National Enters.*, 471 U.S. 539, 548, 105 S. Ct. 2218, 2224 (1985). In this context, the term "copying" constitutes a "shorthand for the infringing of any of the copyright owner's five exclusive rights, described at 17 U.S.C. § 106." *Microsoft Corp. v. Harmony Computers & Elecs., Inc.*, 846 F. Supp. 208, 210 (E.D.N.Y. 1994 (citation omitted). Here, defendants are infringing the Publishers' exclusive rights under § 106, of reproduction, distribution, display, and the right to creative derivative works, and have therefore violated Section 501(a) of the Copyright Act. Defendants are also secondarily liable for encouraging and inducing third parties in the United States to engage in these same types of

infringement, and for profiting from such infringement in circumstances where they have the ability to control the third-party activities.

> **a.     Plaintiffs Hold the Necessary Copyright Interests**

As set forth in each of the Publishers' individual declarations, the Publishers hold a valid copyright interest in each of their respective magazine issues. Under the Copyright Act, a copyright interest inheres in any work of authorship from the moment of creation. *Well-Made Toy Mfg. Corp. v. Goffa Intern. Corp.*, 210 F. Supp.2d 147, 157 (E.D.N.Y. 2002) (*citing* 17 U.S.C. § 102(a)). A valid certificate of copyright registration constitutes *prima facie* evidence of the validity of the copyright and of ownership (17 U.S.C. § 410(c)). As more fully described in the attached declarations, in most cases plaintiffs have either received copyright registrations for the issues of their magazines referenced in the Complaint or applied for expedited registration of such issues.

For each magazine, the individual Publisher is the owner of the copyright interest in the magazine as a whole as a "collective work", defined as "a work such as a periodical issue … in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.[5] 17 U.S.C. § 101. The Act makes clear that "[c]opyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole …." 17 U.S.C. § 201(c); *see also New York Times Co. v. Tasini*, 533 U.S. 483, 488, 121 S. Ct. 2381, 2386 (2000).

This Court has confirmed that a pending application for copyright registration is sufficient in order to proceed with a copyright infringement action. *See Salerno v. City Univ. of N.Y.*, 191 F. Supp. 2d 352, 356 (S.D.N.Y. 2001) (pending application sufficient); *Well-Made Toy Mfg. Corp.*, 210 F. Supp.2d at 157 (citing *Nimmer on Copyright* for same proposition), *aff'd*, 354 F.3d 112 (2nd Cir. 2003); *but see U-Neek, Inc. v. Wal-Mart Stores, Inc.*, 147 F. Supp.2d 158, 169-170 (S.D.N.Y.

---

[5] The Publishers also hold a copyright in many individual articles, photographs and other content of their magazines, and hold licenses with respect to other content included therein.

2001) (district courts without subject matter jurisdiction if party does not have actual certificate of registration or denial from Copyright Office). Here, because the infringing magazine copies appearing on the Infringing Website are for the most part current or very recent issues, at the time that they learned of the Website most of the Publishers had not yet received a copyright registration for those issues, and in some cases had not yet even applied for registration. Yet all of the Publishers have applied for and/or now hold registrations[6] for at least some of the issues appearing on the Infringing Website, as specifically set forth in the annexed declarations. As to most of the remaining issues on the Infringing Website, the Publishers' applications for federal registration are pending and the emergency relief requested, as explained in Point III below, would extend beyond the existing and pending applications to each issue of plaintiffs' publications, as created.

### b.    Defendants Are Direct Infringers

Although proof of infringement often involves a determination by the Court as to whether a defendant has had access to the allegedly infringed work, and whether the allegedly infringing work is substantially similar, this is one of the rare cases where there is direct proof of actual copying, and thus no need to revert to indirect evidence. *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992) ("Copying in the first instance may be established by direct or indirect proof. Though direct proof may not be routinely available, its potential should not be overlooked.") One need only glance at the scanned images of plaintiffs' magazines that appear on defendants' Infringing Website to see that they are exact digital copies of the original physical magazine issues, with only minor (and legally insignificant) variations caused by the act of processing the magazines through a scanning device, such as blemishes, streaks and lines.

---

[6] Requesting expedited treatment can shorten the processing time for copyright applications by the Copyright Office from several months to a matter of days or weeks. The processing fee for expedited registrations is $685 per registration, and thus the Publishers' efforts to expedite multiple registrations has been a very significant expense and taken some time. *See* www.copyright.gov/docs/fees.html. The effective date of a copyright registration is the date upon which the application is received by the Copyright Office, assuming it is later deemed acceptable for registration (that is, the registration "relates back" to the date of filing of the application). 17 U.S.C. § 410(d).

It is equally evident that notwithstanding defendants' invitation to users to upload their own material, the vast majority of these scanned magazines were uploaded by defendants or their cohorts. When plaintiffs learned of the Infringing Website within a few weeks of the Site going live, it was already filled with magazine content, all of it purportedly uploaded "anonymously". Declaration of Andrew Blau, sworn to August 19, 2008 ("Blau Decl."), ¶ 24. The content – literally hundreds of whole magazines – is of a uniform quality and free of the myriad errors one would expect to see in materials scanned by a wide variety of users, using different types of equipment, with differing skill and attention to detail. Also, there has been virtually no duplication of magazine issues on the Infringing Website, which would also be expected if multiple third-party users were scanning and uploading materials independently. And then, tellingly, many of the magazines uploaded have had their bar codes and/or mailing address information obscured in the precisely same way: by the apparent physical application of gray or white strips of paper to cover the information before scanning, by the individual doing the scanning. Blau Decl., ¶ 24. As defendants have publicized the Site in the approximately one month since it was launched, a few third-party users appear to have begun uploading content;[7] as of August 12, 2008, there were fewer than 35 such users. Blau Decl., ¶ 66. By contrast, the first 700 magazines uploaded to the Infringing Website were posted anonymously. *Id.*, ¶ 66.

This all constitutes overwhelming evidence – particularly at the preliminary injunction stage – that it is defendants themselves who uploaded the bulk of the Infringing Website's content.

There is strong evidence that defendant Budd (and to the extent it is a real company, Salveo) controls the Site as owner, suggesting that the scanning and loading of magazines has been accomplished at his direction or under his control, and that he is responsible for determining the

---

[7] It is impossible to determine how many actual third-party users are uploading content, because the Infringing Website only indicates usernames, without any other information such as email address, location, etc. Thus, it is possible that some of the purported users are mere aliases for defendants, utilized to give the appearance that others are uploading material to the Site. Blau Decl., ¶ 66.

functionality of the Site, as well as its text (*e.g.*, the Terms of Use). The Publishers also have reason to believe that Cybernet and Switchworks are responsible for hosting the Infringing Website, and for "serving" it to users; they have continued to do so despite notice from plaintiffs of the infringement. Switchworks and Ross, it appears, have provided significant financial and business support for the Mygazines venture. Blau Aff't, ¶ 51-52. Abbas and Schwartz appear to have helped build the Site itself, with full knowledge of the infringing nature of the Site, and they continue to play an active role in creating infringing "mygazines" for public consumption. Declaration of Barry Kuang Pai-Chun, sworn to August 29, 2008 ("Pai-Chun Decl."), ¶ 41. Finally, given the sheer volume of scanned material on the Site, plaintiffs believe other unidentified "John Does" are involved in infringing acts, although their whereabouts are unknown.

Given defendants' actions targeting U.S. publishers and consumers and affecting U.S. commerce, and the clear application of the Copyright Act to such conduct, this Court clearly has subject matter jurisdiction over this action, even though some of the defendants are based in Canada and part of the chain constituting infringement may have occurred in that country.[8] There is already – before discovery commences – concrete evidence that of the small number of actual third-party users who have uploaded content to the Site, at least two reside in the United States (both in New York State). Blau Decl., ¶ 67. The uploading of copyrighted magazines by these users (and likely others) constitutes direct infringement in the U.S., and defendants Budd and Salveo have induced such infringement, as discussed in Section II.A.1.c. *infra*, which brings those defendants' acts in Canada under the jurisdiction of the Act. *See, Armstrong v. Virgin Records,*

---

[8] Likewise, this Court has personal jurisdiction over these Canadian defendants on multiple bases. Under New York's long-arm statute, defendants are subject to personal jurisdiction pursuant to CPLR § 302(a)(1) because they operate a highly interactive website sufficient for the Court to find defendants transact business within the state. *See Citigroup Inc. v. City Holding Co.*, 97 F. Supp.2d 549, 565 (S.D.N.Y. 2000); *National Football League v. Miller*, 2000 WL 335566, *2 (S.D.N.Y. Mar. 30, 2000). Defendants also are subject to personal jurisdiction under CPLR 302(a)(3) for committing torts outside the state that have consequences in New York, from which they derive, or intend to derive, revenue. *See Energy Brands Inc. v. Spiritual Brands, Inc.*, 2008 WL 274276 (S.D.N.Y. July 16, 2008).

*Ltd.*, 91 F. Supp.2d 628, 635 (S.D.N.Y. 2000) (holding that where direct acts of infringement occur within the United States, subject matter jurisdiction may exist for a plaintiff to seek to hold a foreign defendant contributorily or vicariously liable for those acts). Further, the transmission or display of works subject to copyright in the U.S., to computers in the U.S., constitutes direct infringement on the part of all of the defendants, regardless of where the transmission is initiated. *Twentieth Century Fox Film Corp. v. iCraveTV*, 2000 WL 255989 (W.D.Pa. Feb. 8, 2000) (citing *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998); *see also United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp.2d 198 (S.D.N.Y. 2002). Already, public statistics show that over 50% of all traffic to the Site originates in the United States. Blau Decl., ¶ 65. Although the U.S. copyright laws do not apply extraterritorially (*see Subfilms, Ltd. v. MGM-Pathe Communications*, 24 F.3d 1088 (9th Cir. 1994), here plaintiffs only seek relief addressing the conduct that <u>does</u> fall under the laws of the United States.

As explained below, defendants' above-described actions constitute violations of at least four of the exclusive rights reserved to the plaintiffs under 17 U.S.C. § 106:  the reproduction right, the distribution right, the display right, and the right to create derivative works.

### (1)    Violation of the Reproduction Right

There can be no question but that the scanned versions of the Publishers' magazines that appear on the Infringing Website are "copies" under the Copyright Act.  A scan of a printed work is a stereotypical "reproduction", little different from a photocopy except that it is stored as a digital file.  As demonstrated above, it is defendants themselves who have created the bulk of these multiple infringing digital copies with a scanning device, and each such digital copy is an unauthorized, infringing reproduction.    Thus, this act alone constitutes direct copyright infringement.  *See, e.g., American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 916-17 (2d Cir. 1994) (addressing direct mechanical copying).

The Site itself states that scanned files are "converted by our system into an interactive

publication." Blau Decl., ¶ 28. This "conversion" includes the creation of a separate, digital "table of contents", formatted differently than the table of contents in the original magazine. *Id.*, ¶ 28, Ex. 6. The Site actually converts each page of the original file that has been uploaded into at least three different files with images stored in several different sizes. Pai-Chun Decl., ¶¶ 8-9. These variously sized files themselves are each "mirrored" – that is, stored in more than one location – on at least two separate computer servers hosted by defendant Cybernet. *Id.* In all, therefore, each uploaded article results in at least six permanent copies of the article stored on servers owned or controlled by defendants Budd and Cybernet/Switchworks. The conversion of files into "interactive publications" and the duplication of the files in different sizes and in different physical locations, constitute additional violations of the reproduction right by defendants and therefore direct infringements even assuming *arguendo* that some of the magazines were originally scanned by independent third-party users.

Because all of the above acts constitute or involve copying of copyright-protected works, defendants can take no solace from the "first sale" doctrine. That doctrine recognizes that the owner of a lawful tangible copy of a work is entitled to display, sell, or otherwise use ***that particular tangible copy*** in certain limited circumstances (17 U.S.C. § 109; *see Bourne v. Walt Disney Co.*, 68 F.3d 621, 632 (2d Cir. 1995)); for example, a consumer who buys a magazine at a newsstand or subscribes to it, may sell that specific tangible copy on eBay or to a used bookstore, but the first sale doctrine does not give that consumer the right to duplicate it, display or distribute unauthorized duplicates, or create derivative works from the magazines, as defendants are doing here.

**(2)      Violation of the Distribution/Display Right**

Defendants are also infringing the Publishers' exclusive right to distribute their works and display their works publicly.[9]  17 U.S.C. § 106. "As to the latter, by definition, to display a

---

[9] An unauthorized display is only infringing if it is public. "To perform or display a work 'publicly' means (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or (2) to transmit

work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process." *Nimmer on Copyright* § 8.20[A] (citations omitted). This includes "projection of an image on a screen ... and the transmission of an image by electronic or other means, as well as the showing of an image on a cathode ray tube, or similar apparatus in connection with computers...." *Id.* (*citing* H. Rep., p. 64). A digital transmission of images delivered to a computer over the Internet also constitutes a violation of the distribution right. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007). Here, because the display and distribution of magazine content by the Infringing Website tend to overlap or merge, we address these transmissions in the context of the display right.

The most comprehensive judicial explication of the display right in connection with Internet websites is the *Perfect 10* case, where the Ninth Circuit explained that for photographic images, "the image stored in the computer is the 'copy' of the work for purposes of copyright law" and "[t]he computer owner shows a copy 'by means of a ... device or process' when the owner uses the computer to fill the computer screen with the photographic image stored on that computer, or by communicating the stored image electronically to another person's computer." *Id.* at 1160. Applying that analysis here, the serving of jpg images of plaintiffs' magazines to visitors to the Infringing Website, constitutes a "display".[10]

---

or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. 101. "[A] transmission need not be made directly to the public in order for there to be a public performance or display"; rather, "Congress intended the definitions of 'public' and 'performance' to encompass each step in the process by which a protected work wends its way to its audience." *National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 12 (2d Cir. 2000). A transmission by means of a publicly available website is clearly a public display. *See, e.g., Getaped.com, Inc. v. Cangemi*, 188 F. Supp.2d 401, 401-02 (S.D.N.Y. 2002); *Cartoon Network LP v. CSC Holdings, Inc.*, 2008 WL 2952614, *17 (2d Cir. Aug. 4, 2008) (transmission of a digital copy <u>created by</u> user on cable system and ordered by same user not "public").

[10] In *Perfect 10*, the Ninth Circuit drew a distinction between a service that provided HTML instructions to the user's browser, directing the user's computer to the website that actually delivered the content on the one hand; and a service that serves up the content directly, on the other. *Id.* at 717. The former did *not* infringe the display right of the owner of the underlying work, while the latter does infringe that

The Site violates the display right in several different ways. When a user views the "flipbook" version of the magazine issue, the entirety of the magazine issue is displayed. In addition, the Site also "displays" the magazine covers in several locations on the Site and, displayed on the primary web page for each magazine issue, is the first page of each article within the magazine – allowing readers to jump directly to the entirety of those articles without flipping through the whole magazine, and skipping all of the advertisements. This recompiling of the magazines also implicates the right to create derivative works, discussed below.

### (3)    Violation of the Right to Create Derivative Works

Copyright owners also hold the exclusive right to create secondary works based on their original work, which generally take the form of derivative works or compilations. Section 101 of the Copyright Act defines a derivative work as "a work based upon one or more pre-existing works", including "a work based upon one or more preexisting works, such as a translation, … abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted". 17 U.S.C. §§ 101. A compilation is a work in which the original copyright holder's work is combined with other works into a new whole, and there is separate protection for the selection, order and arrangement of the constituent work. *See Feist,* 499 U.S. at 358, 111 S. Ct. at 1294. As noted *supra* at Section II.A.1.a., a magazine is a prototypical example of a "collective" work created pursuant to this exclusive right, because it consists of an *authorized* combination of various works authored by different individuals (some authored by employees as works for hire and owned by the publisher, some not).

A violation of the right to create derivative works occurs when an infringer recasts or

---

exclusive right. In the instant case, the Infringing Website serves up the content directly: it provides direct access to the photographic images, so under the Ninth Circuit's "server test", the Site clearly violates the exclusive display right of the Publishers. From a technical point of view, when a user visits the Infringing Website, he or she is visiting the "front end" servers hosted by other web hosts such as PRQ INET in Sweden; however, when the user views a magazine, all of the magazine images are served from one of the Cybernet servers, which are under the direct control of the defendants. *Id.*

adapts another's work of authorship without permission.    *Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*, 996 F.2d 1366, 1373 (2d Cir. 1993).   By providing the functionality to facilitate the creation of "mygazines", the Infringing Website creates or permits the creation of several types of *unauthorized* derivative works based on the Publishers' magazines.   The owners of the Infringing Website promote this namesake functionality with gusto, emphasizing that it allows users to clip and recompile articles from different magazines, from different publishers, published at different times, into a new work that is then made available to the public.   The Site itself describes the process as follows:

> *So what are you to do with all these articles you like? Why not archive them into your own personal magazines, or, "mygazines": a collection of articles arranged just the way you like them. Each of your mygazines can be focused on an area of interest – you could setup "recipes" mygazines and store all those pie recipes you found. Redecorating your bedroom? Create "bedrooms" mygazines and store all the articles you find on bedroom décor. You can create as many mygazines as you like and store as many or as few articles in each as you like. The possibilities are endless!*

Blau Decl., ¶ 29.   It would be difficult to imagine a better description of an infringing derivative work than this.

Just as in the case of the uploading of plaintiffs' magazine files to the Infringing Website, many of the "mygazines" on the site bear distinct hallmarks indicating that they have been created by defendants, not by third-party users.   For instance, a user named "Hamidskey" (who appears to be defendant Abbas, a co-creator of the Infringing Website) has created at least 13 mygazines.   Another user named "yms" (who appears to be defendant Schwartz, the other co-creator) has created at least 14 mygazines.   Koonce Decl., ¶¶ 5-6.   To the extent some or all of the defendants have themselves created infringing mygazines, they have directly infringed the Publishers' copyrighted works; to the extent third-party users create these infringing "mygazines", defendants are secondarily liable for that conduct, as explained below.

> **c.    Defendants Are Secondarily Liable for the Acts of Mygazines.com Users**

In addition to being obvious direct infringers, defendants are liable for infringement by others that is facilitated through the Infringing Website. The law of secondary liability is a tort concept that has long been recognized as applicable to copyright law. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 486, 104 S. Ct. 774, 811 (1984). While the parameters of secondary liability have undergone some development and clarification in recent years, especially in connection with Internet websites, defendants' flagrant actions here bring them squarely under the doctrine, under any interpretation.

There are two types of secondary liability recognized in copyright cases: contributory liability and vicarious liability. We address defendants' actions under both theories in turn below.

> **(1)    Contributory Infringement**

In *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971), the Second Circuit stated that "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." In the recent *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.* case, involving the liability of services that facilitated unauthorized peer-to-peer file sharing, the Supreme Court made clear that the key to infringement in this context is inducement. 545 U.S. 913 (2005); *see also Warner Bros. Entertainment Inc. v. Ideal World Direct*, 516 F. Supp.2d 261, 268 (S.D.N.Y. 2007) ("Secondary liability may be imposed on a defendant who does nothing more than encourage or induce another to engage in copyright infringement"). Importing the inducement rule from patent law to copyright law, the Supreme Court held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Grokster* at 936-37; 2780. Mindful of the possibility of hindering legitimate commerce, the Court stressed that the inducement rule

"premises liability on purposeful, culpable expression and conduct". *Id.* at 937.

That there is purposeful culpable expression and conduct in this case is crystal clear; indeed it is conceded. The very name and tagline ("Upload. Share. Archive.") of the Infringing Website indicates that it is a place for users to upload and make use of copyright-protected magazines content. As noted in *Grokster*, "[t]he classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations". *Id.* at 916. Defendants' tagline and logo have been used extensively to promote the Site, throughout the Internet. Blau Decl., ¶¶ 33, 61. Every instruction on the Site, including in the "Tour" and the "Frequently Asked Questions", affirmatively urges users to upload magazines to be displayed to the public, and to create derivative works from the magazines archived on the site. Blau Decl., ¶¶ 11, 28, Ex. 6. Also, as was true of the *Grokster* defendants, the Mygazines defendants have not developed or installed filtering software; to the contrary, the "Terms of Use" indicate that users who have merely purchased a copy of a magazine should feel free to scan and upload a copy of that magazine to the Site. *Id.*, ¶ 31. The owner of the Infringing Website has admitted in a statement that the Site is directly addressed towards "changing" [read: "undermining"] the traditional magazine publishing industry itself, not towards non-infringing uses. *Id.*, ¶ 62, Ex. 24.

There is some evidence that users are beginning to respond to defendants' inducement and to use the Infringing Website by, as defendants encourage them to do, uploading magazines and creating infringing "mygazines" which are then displayed to the public. In so doing, these users are committing direct acts of infringement, at the encouragement of defendants and, consequently, plaintiffs are likely to prevail on their claims that defendants are secondary liable for contributory infringement.

### (2) Vicarious Liability

Defendants' above-described actions render them vicariously liable, as well. A defendant is vicariously liable for the infringing acts of others where the defendant has a "right and ability

to supervise [that] coalesce[s] with an obvious and direct financial interest in the exploitation of copyrighted materials." *Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955, 971 (2d Cir. 1997) (*citing Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)). Knowledge on the part of the defendant is not required. *Peer Int'l Corp. v. Luna Records, Inc.*, 887 F. Supp. 560, 565 (S.D.N.Y. 1995) ("Individuals who have the right and ability to supervise infringing copyright and a direct financial interest in such activities are not shielded from liability even though they have no actual knowledge of the infringement.")

Here, defendants clearly have a direct financial interest in the exploitation of plaintiffs' copyrighted magazines at the Infringing Website. This financial interest does not just apply to defendant Budd, but certainly extends to Cybernet, which hosts the content, and to Rick Ross and Switchworks, based on their presumed financial investment in the enterprise. Although defendants call their financial model "inactive", their own statements indicate that they fully expect to make money from operation of the Infringing Website, and the burden should not be on plaintiffs to guess what these various revenue models might be, in order to demonstrate a likelihood of success on this claim, especially where defendants are flaunting the fact that their model has "lots of hidden potential revenue". Blau Decl., ¶ 62, Ex. 24. And some monetization elements have already emerged: for instance, defendants derive revenues through an arrangement with Amazon.com by linking to plaintiffs' Magazines on Amazon.com, and they offer an application on Facebook.com allowing users to "purchase" magazines with scrip that can then be "gifted" to friends.

Defendants also have the right and ability to supervise and control the infringing activity. The Site's Terms of Use clearly encourage the uploading of infringing material and also state that "Mygazines may remove any Content and Mygazines accounts at any time for any reason (including, but not limited to, upon receipt of claims or allegations from third parties or authorities relating to such Content), or for no reason at all". This demonstrates that defendants claim the right to control what content is uploaded, but choose not to do so. Also, defendants

require users who are uploading scanned magazines to create titles for each magazine based on the title and date of the magazine issue, and these are used as labels for the uploaded files. With all of these indicia of control and financial interest, there is a strong likelihood of success on the merits of a claim of vicarious liability. *See Peer Int'l Corp. v. Luna Records, Inc.*, 887 F. Supp. 560, 565 (S.D.N.Y. 1995); *Shady Records, Inc. v. Source Enterprises, Inc.*, 2005 WL 14920, *23 (S.D.N.Y. Jan. 3, 2005) ("[a]ny individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity, is personally liable for that infringement.") (citation omitted); *Yash Raj Films (USA), Inc. v. Bobby Music Co. & Sporting Goods, Inc.*, 2006 WL 2853874, *4 (E.D.N.Y. Sep. 29, 2006) (sole owner of defendant had both a direct financial interest in store's activities and right and ability to supervise contractor's activities); *Capitol Records, Inc. v. Wings Digital Corp.*, 218 F. Supp.2d 280, 285 (E.D.N.Y. 2002) (defendant could be held liable for vicarious liability where complaint alleged he "was the sole shareholder who managed and financially benefited from the production and sale of the acts of copyright infringements").

### d. Defendants Cannot Claim the "Safe Harbor" of the DMCA

The Digital Millennium Copyright Act ("DMCA") provides a safe harbor for internet service providers – such as the owners of interactive websites – who operate services which passively allow third parties to post their own content. 17 U.S.C. § 512(c). To qualify for the safe harbor, an ISP must meet certain criteria. First, the ISP must really be "passive" – the storage of the material must be "at the direction of the user". *Id.* Second, the ISP must designate an agent for the service of take-down notices, disclose that agent's contact information and register that agent with the Copyright Office. *Id.* Third, the ISP promptly respond to "take-down notices" from content holders who discover infringing content being hosted by the ISP on behalf of a third party, and send a conforming notice to the ISP's designated agent for DMCA purposes. *Id.* Further, to maintain the safe harbor, the ISP must not: have actual

knowledge that the material or an activity using the material on the system or network is infringing; be aware of facts or circumstances from which infringing activity is apparent (and upon obtaining such knowledge or awareness, must act expeditiously to remove, or disable access to, the material); or receive a financial benefit directly attributable to the infringing activity, where the service provider has the right and ability to control such activity. *Id.*

The Infringing Website does not qualify – or even attempt to qualify – for this safe harbor. As noted, defendants post the bulk of the content themselves, but even as to content posted by others, there is significant alteration of content by the Site, in that it creates tables of contents, creates hyperlinks, and the like – as the Site itself says, it turns the original scanned file into an "interactive publication". It has no designated agent, and indeed even emails sent to its "abuse" address are returned to sender. Blau Decl., ¶ 40. Yet the Site's owners clearly are aware of the strictures of the DMCA, as they include DMCA take-down language on their cloned website dedicated to adult content, Porngazines.com. Blau Decl., ¶ 69. Its owners plainly have knowledge of infringing activity, and even if they could have claimed otherwise previously (which seems highly unlikely), they have been on notice of specific infringing content for several weeks in light of the various cease and desist letters sent by plaintiffs, yet continue to post new infringing content on a daily basis. Plaintiffs also served DMCA take-down notices on all available addresses and email addresses for the Site, but to date none of the infringing magazines have been taken down. Similarly, the web hosts Cybernet and Switchworks received DMCA notices, and also have refused to take down the infringing content. Blau Decl., ¶¶ 41, 43, 45, 50, 51.

In sum, defendants' acts of direct and indirect copyright infringement are so clear –indeed, defendants boast of them – that plaintiffs have readily satisfied their burden of showing a likelihood of success on the merits on their copyright claims. In light of the clear irreparable harm to the Publishers (see section II.B. *infra*) this alone justifies the grant of the injunctive relief requested.

2.    **Trademark Claims**

a.    **Trademark Infringement and Unfair Competition**

Under 15 U.S.C. §§ 1114 and 1125(a), plaintiff in a trademark infringement and/or unfair competition action must show that the defendant (1) without consent, (2) used in commerce, (3) a reproduction, copy or colorable imitation of plaintiff's registered mark, as part of the sale or distribution of goods or services, and (4) that such a use is likely to cause confusion. *Time, Inc. v. Petersen Publ Co. LLC*, 173 F.3d 113, 117 (2d Cir. 1999). Accordingly, a claim of trademark infringement is analyzed under the familiar two-prong test that looks first to whether plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of defendant's goods. *See Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).[11]

First, the evidence establishes that plaintiffs each have valid trademarks entitled to protection under the Lanham Act, whether or not registered and including protection for "trade dress", *i.e.* the covers of the Magazines.[12] As to plaintiffs' registered marks,[13] registration creates a presumption of validity. 15 U.S.C. § 1057(b); *The Deal v. Kornagy Publ., Inc.*, 309 F. Supp.2d 512 (S.D.N.Y. 2004) (Scheindlin, J.). Further, many of plaintiffs' marks are now incontestable and therefore entitled to an even greater scope of protection. *See Savin Corp. v.*

---

[11] The test for trademark infringement under New York state common law (Comp., ¶¶ 281-87) is functionally the same. *Henegan Construction Co., Inc. v. Heneghan Contracting Corp.*, 2002 U.S. Dist. LEXIS 10545, *28 (S.D.N.Y. May 31, 2002); *see also Frank's Rest, Inc. v. Lauramar Enters., Inc.*, 273 A.D.2d 349, 711 N.Y.S.2d 433, 435 (2d Dep't 2000); *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980) (using same analysis for state and federal trademark infringement claims).

[12] *Nora Beverages, Inc. v. The Perrier Group of America, Inc.*, 269 F.3d 114, 118 (2d Cir. 2001) (trade dress encompasses the "overall design and appearance that makes the product identifiable to consumers"). Magazine covers have been held to be protected as the trade dress of a magazine. *Time Inc. v. Globe Communications Corp.*, 712 F. Supp. 1103, 1108-09 (S.D.N.Y. 1989) (publisher entitled to preliminary injunction against infringing magazine's use of "People Weekly" magazine's distinctive cover format); *National Geographic Soc. v. Condé Nast Publications Inc.*, 687 F. Supp. 106, 109 (S.D.N.Y. 1988) (travel magazine had protectable interest in trade dress for magazine cover).

[13] *See* Lee Decl., ¶¶ 3, 6, 9, 12, 15, 18, 21 and 24; Weaver Decl., ¶ 8; Antonello Decl., ¶ 8; Daniels Decl., ¶¶ 8 and 9; Bouten Decl., ¶ 7; Shapiro Decl., ¶ 8; Spooner Decl., ¶ 9; Simonton Decl., ¶ 6; Thompson Decl., ¶ 7; Malkani Decl., ¶ 8; Falkenberg Decl., ¶ 8; Sirota Decl., ¶ 7; Bellando Decl., ¶ 8.

*Savin Group*, 2003 U.S. Dist. LEXIS 19220, *12-13 (S.D.N.Y. Oct. 24, 2003), *rev'd in part on other grounds,* 391 F.3d 439 (2d Cir. 2004) (incontestable registration "shall be conclusive evidence of the registrant's exclusive right to use the registered mark, subject to a limited number of defenses" (citations omitted)).  As to plaintiffs' unregistered marks, Section 43(a) "protects from infringement unregistered trademarks, as well as trade dress[.]"  *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114-15 (2d Cir. 2006) (*citing Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209, 120 S.Ct. 1339, 1342 (2000)).

Second, it is clear from the accompanying declarations that none of the plaintiff-publishers have consented to or authorized defendants' use of their registered or common law marks and such use is therefore without consent and it is clearly in commerce.  *See, e.g.*, Weaver Decl., ¶¶ 6, 11; Antonello Decl., ¶¶ 6, 11; Daniels Decl., ¶¶ 6 and 12.

The third element of the Lanham Act claim is use of plaintiffs' marks in connection with "goods or services".  Clearly defendants are using dozens of plaintiffs' trademarks on and in connection with counterfeit copies of plaintiffs' magazines, defendants' "mygazines", and the Infringing Website, which is itself a "service" in commerce, as Budd's trademark application (Blau Decl. ¶ 58, Ex. 27) attests.  Although the Supreme Court decided in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27, 123 S. Ct. 2041, 2044-45 (2003) that a copyrighted work is not a "product" or "service" for purposes of Section 43(a), nothing in that decision precludes relief here.

First, defendants here are using plaintiffs' trademarks to suggest sponsorship or association with their entire "mygazines" service, *i.e.*, the Infringing Website, not just the copies of plaintiffs' Magazines that are displayed on that website.  Second, *Dastar*, made it clear that a "claim [under Section 43(a)] would undoubtedly be sustained if [defendant] had bought some of [plaintiff's …] videotapes and merely repackaged them as its own".  What happened here fits squarely within that exception to the Court's ruling; defendants have purchased plaintiffs'

magazines and converted them to their own counterfeit online flipbook magazines, which they offer to the public on the Infringing Website.

Third, the very nature of a magazine, as opposed to a book or the video of a television program that was in issue in *Dastar* itself, places it outside the *Dastar* rationale. The *Dastar* Court concluded that "the phrase 'origin of goods' [in § 43(a)(1)(A)] is in our view incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain". 539 U.S. at 31-2, 123 S. Ct. at 2047. But the trademarks at issue here do not just connote the originator of the ideas or the "communications" in the Magazines; instead, they signify a series of publications, each one of which is a collective work embodying ideas and communications from several different sources or creators. The name of the magazine, *i.e.*, the trademark, is not used to identify the creator of all of the ideas in the magazine, but rather to identify the source of a continuing series of publications constituting a recognizable brand.[14] That brand protects not just the copyrighted articles and advertisements in the magazine, but the selection, order and arrangement of them, the layout, the editorial content, the cover, and the physical quality of the magazine (glossy paper, clarity of color, *etc.*). Certainly, if someone took the *Esquire* name and replicated its cover and logo, and appended them to content that did not emanate from Hearst, the public would likely be confused as to the origin or source of the misbranded magazine. Nothing in *Dastar* renders nugatory Judge Newman's oft-cited quote from *Rogers v. Grimaldi*, 875 F.2d 994, 997 (2d Cir. 1989):

> Movies, plays, books and songs are indisputably works of artistic expression and deserve protection. Nonetheless, they are also sold in the commercial marketplace like other more utilitarian products, making the danger of consumer deception a legitimate concern that warrants some government regulation. [citations omitted] … *The*

---

[14] This is precisely why single titles of books are not registrable as trademarks but the titles of serial publications can be registered. *See Herbko Intern., Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1162 (Fed. Cir. 2002) (although book series title may be registered, "title of a single book cannot serve as a source identifier") (*citing In re Cooper*, 45 C.C.P.A. 923, 254 F.2d 611, 614-15, (CCPA 1958) (titles of single books cannot be registered as a trademark)).

> *purchaser of a book, like the purchaser of a can of peas, has a right*
> *not to be mislead as to the source of the product.* [emphasis supplied]

The last element of proof on the Lanham Act claim is whether defendants' use of plaintiffs' marks is likely to cause confusion as to the origin or source of the Magazines or to suggest sponsorship, association or endorsement, determined in the Second Circuit under the test set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495-96 (2d Cir. 1961). A detailed analysis of the *Polaroid* factors is not necessary however in cases such as this one regarding counterfeit marks, which "are inherently confusing". *See Philip Morris USA Inc. v. Felizardo*, 2004 WL 1375277, *5 (S.D.N.Y. June 18, 2004) (granting permanent injunction and finding violation of Lanham Act based on use of counterfeit marks); *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp.2d 284, 287 (S.D.N.Y. 2003) ("confusing the customer is the whole purpose of creating counterfeit goods... Thus, the Court need only determine the more fundamental question ... whether the items at issue here are, in fact, counterfeit and whether Defendants sold those items")(citation omitted).

Counterfeit copies of plaintiffs' marks are used throughout the Infringing Website. A "counterfeit" is "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark". 15 U.S.C. § 1127; *Cartier v. Aaron Faber, Inc.*, 512 F. Supp.2d 165, 169 (S.D.N.Y. 2007) (a product is deemed counterfeit if it contains an original mark that is likely to deceive the public as to its origin); *Cartier v. Symbolix, Inc.*, 386 F. Supp. 354, 361 (S.D.N.Y. 2005) (when an original mark is attached to a product in such a way as to deceive the public, the product itself becomes a 'counterfeit', just as it would if an imitation of the mark were attached). It appears that defendants here purchased genuine copies of magazines published by plaintiffs and, by the scanning and conversion process already described, have created substantially indistinguishable digital copies of the magazines. These in turn bear the original, but now spurious, marks under which they are offered to the consuming public in interstate commerce. A customer viewing the magazines on the Infringing Website bearing these spurious marks is likely

to believe that those unauthorized copies come from plaintiffs or their licensed online retailers and this constitutes a violation of the Lanham Act.

### b.    False Advertising

Defendants are also engaging in false advertising in violation of Section 43(a)(2) of the Lanham Act, 15 U.S.C. § 1125 (a)(2). To succeed on that claim, plaintiffs must demonstrate that "an advertisement is either literally false or that the advertisement, though literally true, is likely to mislead and confuse consumers." *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991). Plaintiffs must also demonstrate materiality – that is, "the plaintiff must also show that the defendants misrepresented an inherent quality or characteristic of the product." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) (internal citation omitted).

Here, defendant Budd's advertisement for the Mygazines.com site on Facebook (Blau Decl., ¶ 60, Ex. 29), makes extensive use of Time trademarks and trade dress to advertise that Site. The clear but false impression that this advertisement is likely to impart to consumers is that Time authorized the Site to display its magazines, and that Time licenses or endorses the Site's use of its magazines, which are both material misstatements about a characteristic of the magazines – their source. Similarly, the Infringing Website itself contains promotional content, such as a revolving, virtual "news rack" that contains a changing assortment of magazine covers including plaintiffs' Magazine covers that creates the same false impression of authorization. *See* Blau Declaration, ¶¶ 32, 72. Accordingly, plaintiffs are likely to succeed in their claim that this promotional content, as well as the Facebook advertisement, violates the Lanham Act's provisions against false advertising, as well.

### c.    Trademark Dilution

Defendants' various uses of different plaintiffs' trademarks on the Infringing Site and particularly, their conjoining of plaintiffs' marks with the MYGAZINES mark (Blau Decl.,¶ 5), are also likely to dilute plaintiffs' famous marks by blurring them in violation of Section 43(c) of

the Lanham Act (15 U.S.C. § 1125(c)), the federal dilution statute, as well as the New York anti-dilution statute.[15]  In addition, defendants' invitation to users of the Infringing Website to create "Mygazines" combining articles bearing trademarks from different magazines, emanating from different publishers, into one new and different magazine and to make that mygazine publicly available, constitutes an independent claim of inducement to dilute or blur plaintiff-Publishers' famous trademarks.

The federal statute allows the owner of a "famous" trademark to seek an injunction against another's commercial use of that mark in commerce, if the latter use begins after the mark has become famous and is likely to cause dilution by blurring or by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury. 15 U.S.C. § 1125(c)(1); *see also Dan-Foam A/S v. Brand Named Beds*, LLC, 500 F. Supp.2d 296, 306-07 (S.D.N.Y. 2007).  Plaintiffs must show that:  (1) their marks are famous; (2) their marks are inherently distinctive; (3) defendants' use of the marks occurred after plaintiffs' marks became famous; (4) defendants have used plaintiffs' marks in commerce; and (5) defendants are diluting the quality of the marks by diminishing their capacity to identify goods and services. *See* 15 U.S.C. § 1125(c)(1); *see also Nabisco Inc. v. P.F. Brands, Inc.*, 191 F.3d 208, 215 (2d Cir. 1999).

To be deemed a famous mark under § 43(c), the mark must be "widely recognized by the general consuming public of the United States as a designation of source of the goods or services

---

[15] New York's anti-dilution statute, N.Y. Gen. Bus. Law. § 360-1 (McKinney's 2008), proscribes actions that are likely to either blur a trademark's product identification or to tarnish the affirmative associations a mark has come to convey. *Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 42 (2d Cir. 1994)(*citing Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1031 (2d Cir. 1989)). Blurring occurs when defendant's actions "rais[e] [t]he possibility that the mark will lose its ability to serve as a unique identifier of plaintiffs' product[s]," (*Deere*, 41 F.3d at 43), or where defendant "is attempting to feed [] upon the business reputation of an established distinctive trademark or name." *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 576 (2d Cir. 1993) (*quoting Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 632 (1977).

of the mark's owner", measured by four factors that courts may use in "determining whether a mark possesses the requisite degree of recognition" to be considered "famous":  (1) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; (4) whether the mark was registered ...."[16]  15 U.S.C. § 1125(c)(2) (A); *see also Dan-Foam A/S*, 500 F. Supp.2d at 307.  It cannot be seriously disputed but that *Time, Newsweek, The New Yorker, Vanity Fair, Sports Illustrated, Vogue, O the Oprah Magazine, Redbook, People*, and others of the titles of magazines published by plaintiffs (and some of the trade dress of those magazines, *i.e.*, their covers) are "famous" marks, highly recognizable and recognized throughout the country and abroad, and registered long before – in some cases decades before – Mygazines.com entered the internet landscape.

Dilution by blurring occurs where defendant uses plaintiff's trademark to identify defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of plaintiff's product. *See Clinique Laboratories, Inc. v. Dep Corp.*, 945 F. Supp. 547, 562 (S.D.N.Y. 1996); *see also Brown v. It's Entertainment, Inc.*, 34 F. Supp.2d 854, 859 (E.D.N.Y. 1999).  To assess whether there is likely to be blurring, courts look to:  (1) similarity of the marks; (2) similarity of the products covered by the marks; (3) sophistication of consumers; (4) predatory intent; (5) renown of the senior mark and trade dress; and (6) renown of the junior mark and trade dress. *See New York Stock Exchange, Inc. v. New York, New York Hotel LLC*, 293 F.3d 550, 558 (2d Cir. 2002) (affirming preliminary injunction based on likelihood of injury due to dilution).  By combining the MYGAZINES mark with plaintiffs' various famous marks on the Infringing Website, defendants are blurring the distinctive value of

---

[16] While registration is a relevant factor, it is not a requirement before a mark will be found famous. *See, e.g., New York State Soc. Of Certified Public Accountants v. Eric Louis Assoc., Inc.*, 79 F. Supp.2d 331, 344 (S.D.N.Y. 1999) (unregistered mark qualified as famous).

those marks and interfering with the ability of them to identify a particular product, in this case, a particular magazine.[17]  Applying the factors outlined in *New York Stock Exchange*, the "mark" used by Mygazines.com is a combination of each of plaintiffs' famous marks and the *Mygazines* mark, such that the common component of both marks is identical; the products are one and the same; magazines are relatively inexpensive and often impulse purchases; clearly defendants have acted with predatory intent as they have as their stated aim trading upon the goodwill inherent in the plaintiffs' famous marks; and the decades of use and widespread recognition of plaintiffs' famous marks prevail resoundingly over defendants' upstart use of the conjoined marks.

There is a second dilution claim (Comp., ¶¶ 270-80) on which plaintiffs are likely to succeed:  defendants are inducing users of the Infringing Site to take individual articles from different magazines, emanating from different publishers and sold under different famous marks, and clip and recompile them into derivative "mygazines".  At the foot of most if not all pages of those articles appears the name of the magazine from which it was taken, *i.e.*, a famous mark. Because users are urged to combine articles from various publishers together into a new product, a "mygazine", that new product will juxtapose the famous marks in a way which blurs or dilutes their distinctive source origination function.

Although Section 43(c) does not expressly provide for secondary liability and the Second Circuit has never addressed the question of whether there is liability for contributory dilution, since the Statute itself expressly exempts "nominative or descriptive use *or a facilitation of such use*" (§ 43(c)(3)(A) (emphasis added)), it necessarily follows that it contemplates that *facilitation of infringing use* **does** provide a basis for liability.  At least one court in this District has found

---

[17] The Supreme Court's *Dastar* holding was limited to Section 43(a) and has no application whatsoever to Section 43(c) dilution claims.  The underlying *Dastar* rationale is based upon desire not to extend the copyright monopoly; that rationale is simply inapplicable to underlying purposes of the dilution statute. Nothing about the fact that, for instance, *Forbes* is the name of a magazine about business, rather than the name of a business school, renders the use of FORBES as the trademark for a calculator any more or less likely to blur the FORBES mark.

that "the viability of such a claim seems entirely plausible – a number of courts have discussed the notion of contributory dilution, and at least one court has implicitly recognized that cause of action". *Steinway, Inc. v. Ashley*, 2002 WL 122929 at * 2 (S.D.N.Y. Jan. 29, 2002) (denying motion to dismiss on contributory infringement claim), *citing Kegan v. Apple Computer Inc.*, 42 U.S.P.Q.2d 1053, 1062, 1996 WL 667808 at * 11 (N.D.Ill. 1996). *See also, McCarthy on Trademarks*, § 25:21.25 at 25-58 (Vol. 4 2008) ("[T]here would seem to be no logical reason why the doctrines of vicarious liability and contributory infringement should not apply to a claim under the federal anti-dilution law").

Contributory liability for passing off and trademark infringement already exists (*see William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 44 S. Ct. 615 (1924)), and common law concepts of vicarious liability have already been imported into trademark law (*see American Tel. & Tel. Co. v. Winback & Conserve Program*, 42 F.3d 1421, 1433 (3d Cir. 1994)). Most tellingly, the Supreme Court extended the inducement doctrine from patent to copyright law in *Grokster* because "[w]hen a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious infringement." 545 U.S. at 930, 125 S. Ct. at 2776. The exact same reasoning applies equally to secondary liability for dilution.

**B.    <u>Irreparable Harm</u>**

The second burden that plaintiffs must meet in order to receive the emergency relief sought is to establish that they will suffer irreparable harm. That plaintiffs have established irreparable harm in this case is clear, whether based upon the presumption that arises in this Circuit given the nature of plaintiffs' claimed rights, or on the facts as detailed in the accompanying declarations and affidavits.

We begin with the that well-established presumption in this Circuit that "'generally when

a copyright plaintiff makes out a prima facie showing of infringement, irreparable harm may be presumed'". *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.,* 312 F.3d 94, 96 (2d Cir. 2002) (per curiam) (quoting *ABKCO Music, Inc. v. Stellar Records, Inc.,* 96 F.3d 60, 64 (2d Cir. 1996)); *see also Fisher-Price, Inc. v. Well-Made Toy Manufacturing Corp.*, 25 F.3d 119, 124 (2d Cir. 1994) ("when a copyright is infringed, irreparable harm is presumed; this is because the confusion created in the marketplace will damage the copyright holder in incalculable and incurable ways."). Likewise, irreparable harm is also presumed in a trademark infringement action when there is a likelihood of confusion (*American Cyanamid Co. v. Campagna Per Le Farmacie In Italia S.P.A.*, 847 F.2d 53, 55 (2d Cir. 1988) ("In trademark cases, a showing of likelihood of confusion as to source or sponsorship [of the goods] establishes the requisite likelihood of success on the merits as well as risk of irreparable harm.")(internal citations omitted); *see also New Kayak Pool Corp. v. R&P Pools, Inc.*, 246 F.3d 183, 185 (2d Cir. 2001) ("a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm") (internal quotation and citation omitted)). In addition, where, as here, there has been deliberate copying, the presumption becomes virtually irrebuttable. *See R.J.R. Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979); *Friendly Publs., Inc. v. Creative Handbook Servs.*, 79 Civ. 2758-CSH, Slip. Op., October 24, 1979 (S.D.N.Y.).

Even absent that presumption, it is palpably evident that plaintiffs here have been and will continue to be irreparably harmed by defendants' conduct. Defendants have lifted, wholesale, plaintiffs' valuable intellectual property, including the content of plaintiffs' copyrighted magazines, the brands plaintiffs have worked to establish as reflected in their trademarks and trade dress of those magazines, and the substantial good will plaintiffs have invested much time, effort, advertising and promotion to develop over, in some cases, decades. Blau Decl., ¶ 71. Scanning entire issues of magazines, uploading them, and encouraging users to read them online instead of buying copies at the newsstand or by subscription or at plaintiffs'

own authorized and licensed websites, is a total usurpation of plaintiffs' property. Taking articles from magazines published by one plaintiff and combining them in "Mygazines" with articles from other magazines published by other plaintiffs or other copyright holders, usurps plaintiffs' right to package or unbundle their collective works as they choose. Editorial decisions at any given magazine reflect the publisher's views as to what will be of interest to their readers, what will make their readers subscribe or return to the newsstand to buy the next issue, what advertisements will appeal to their target readership, in what order stories should be presented, and with what layout. These and countless other editorial considerations that go into each issue of the magazine are instrumental in establishing the "brand" that that magazine represents. Defendants are effectively undoing all of that creative and editorial decision making process by encouraging users to unbundle plaintiffs' content and recompile it.

Plaintiffs have absolutely no way of knowing how many potential purchasers of their magazines have declined or will decline to purchase them because they can simply read them for free online at this unauthorized site. Likewise, plaintiffs have no way of quantifying how many consumers declined to visit plaintiffs' own authorized sites because some of the same magazines are available for free at mygazines.com. Further, much as in the case of music industry websites such as Napster and Grokster which allowed the sharing of individual songs from whole albums, consumers may simply read a single article or the headline article from a particular issue of one of plaintiffs' magazines on the Infringing Website, rather than buying the entirety of the magazine or subscribing to it. Likewise, plaintiffs have no way of knowing how many advertisers who currently advertise in their magazines might otherwise be inclined to advertise on plaintiffs' magazine websites but, seeing their advertisements distributed for free on the Infringing Website, will decline to do so. *See Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995) (finding that "irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial"); *see also*

*Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 127 (S.D.N.Y. 1993) (finding irreparable harm where competitor's use of confusingly similar and diluting mark would cause damage to reputation that is difficult to prove or quantify).

Defendants undoubtedly know, as the selection of titles on the Infringing Website indicates, that most magazine content is time sensitive – plaintiffs' publications are weeklies, bi-weeklies, and monthlies. The window of opportunity for sales, particularly newsstand sales and for unique visitors to Plaintiffs' authorized websites, is an extremely limited one. By usurping that window of opportunity, defendants are threatening the magazine industry's fundamental publishing model, as Mygazines itself has acknowledged in its letter to the *Press Gazette*. Blau Decl., ¶ 62, Ex. 24. That is, without question, the very essence of irreparable harm. *See Napa Valley Publishing Co. v. City of Calistoga*, 225 F. Supp.2d 1176, 1182 (N.D.Cal. 2002) (preventing newspaper from distributing papers on the newsstand would cause irreparable injury; the "loss is especially significant (and irremediable) for a periodic publication whose publication loses value with each passing period. That lost opportunity to disseminate time sensitive speech cannot be remedied after trial. Preventing injury that cannot later be repaired is precisely the kind of irreparable injury that warrants preliminary injunctive relief").

**C.    The Balance of Hardships Weigh in Favor of Injunctive Relief**

As described above, the harm confronting plaintiffs is potentially devastating:  if unfettered, it could seriously damage the business model of the magazine industry. In contrast, any resultant injury to defendants from a temporary restraining order and preliminary injunction would be slight indeed. Their website is a fledgling one, still in its early days, and has not yet built its market or following. Defendants maintain although they plainly intend to monetize their website, they have not yet done so. No advertising appears on the website and, for now, Mygazine.com appears to offer its products and services *gratis*. Thus, assuming the veracity of their public position, defendants cannot credibly maintain that they will suffer any financial

injury as a consequence of a temporary injunction, beyond whatever small part of limited initial investment they have made to date to launch the Infringing Website might be lost, if it turns out that the injunction was improvidently granted.

Since virtually all that is on defendants' Infringing Website is *plaintiffs'* copyrighted content and *plaintiffs'* trademarks and those of other publishers, defendants cannot claim that any property of their own is at risk, or that a temporary injunction will interfere with their legitimate rights to disseminate content or their First Amendment right to speak publicly. Indeed, the only speech at issue is plaintiffs' copyright-protected content. The public interest would also be served by the issuance of an injunction in this case, because an injunction will "preserve the integrity of the copyright laws which seek to encourage individual effort and creativity by granting valuable enforceable rights." *Atari, inc. v. American Philips Consumer Electronics Corp.*, 672 F.2d 607, 620 (7th Cir. 1982).

Perhaps most importantly, even if defendants could establish some theoretical adverse financial impact from a temporary injunction, they are in no position to complain about it, as they should have considered the consequences of their actions *before* they created a website that has copyright infringement as its very purpose and design. *See Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (defendant cannot claim to be harmed "since it brought any and all difficulties occasioned by the issuance of an injunction upon itself"); *Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 312 (D.N.J. 1998) ("[d]efendant cannot complain that he will suffer irreparable injury if a preliminary injunction is issued because he misappropriated the Mark … with full knowledge of the rights of the Plaintiff"). As the Second Circuit has long recognized, in balancing hardships as between plaintiffs and defendants, "[a]dvantages built upon a deliberately plagiarized make-up do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed." *Id.; Bantam Books, Inc. & Louis L'Amour v. Caroll & Graf Publishers, Inc.*, 12 Media L. Rep. 2326

(S.D.N.Y. May 28, 1986), quoting *My-T Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d. Cir. 1934).

## III.

### SCOPE OF THE INJUNCTION SOUGHT

Plaintiffs seek to enjoin defendants from infringing both its current copyrighted magazine content, and also its future copyrightable content, given the established likelihood – indeed the inevitability[18] – that defendants will infringe plaintiffs' future works each week or month as they go on sale, unless enjoined. In the Second Circuit, such relief may be available where, as here, defendants have "engaged in a pattern of infringement of a plaintiff's registered copyrights and can be expected to continue to infringe new copyrighted material emanating in the future from the plaintiff." *In re Literary Works in Electronic Databases Copyright Litigation*, 509 F.3d 116, 123 (2d Cir. 2007), *citing Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1349 (8th Cir. 1994) and *Pacific and Southern Co v. Duncan*, 744 F.2d 1490, 1499 (11th Cir. 1984). This "sort of prophylactic relief furthers the purposes of the Copyright Act generally and does not undermine the intended effect of section 411(a)." 509 F.3d at 123.[19]

In *Pacific and Southern Co.*, defendants had regularly copied a daily news broadcast and sold the tapes, and would have continued to do unless enjoined; the Eleventh Circuit found that unless plaintiff could obtain an injunction against future infringement, it would only be able to enforce its copyrights against defendant by finding out which stories have been copied and sold,

---

[18] Defendants continue to add scanned copies of magazines published by plaintiffs on a daily basis. Blau Decl., ¶ 3.

[19] The Second Circuit's ruling in *In re Literary Works* declined to extend jurisdiction to unregistered copyrights where an estimated 99 percent of the claims at issue were never registered, despite more than ample opportunity – in some cases decades – to do so. Plaintiffs here are in a totally different situation: their works have not yet even been created but will be created, and published on a weekly, biweekly, or monthly basis. Even if plaintiffs were willing to pay the nearly-$670 fee for expedited registration from the Copyright Office for each magazine issue, they would not receive the registrations which are otherwise the predicate for suit, for eight to fifteen days – which might exceed the very life-span of their products on news racks! By that point, the copies will have been posted on the Infringing Website, potentially displacing all sales. Given the established threat of continuing infringement in the circumstances, plaintiffs are entitled to an injunction extending beyond those issues that have been registered.

registering those stories, and bringing serial infringement actions against the defendant.  The Court held that "[T]his is a classic case, then, of a past infringement and a substantial likelihood of future infringements which would normally entitle the copyright holder to a permanent injunction against the infringer pursuant to 17 U.S.C. § 502(a)."  744 F.2d at 1499  The Court concluded that the power of the district courts to issue injunctions is not limited to works already in existence, but applies to future works as well.  *Id.*  Similarly, in *Olan Mills*, a professional photographer and society of professional photographers brought an action against a photo developer who, they alleged, was likely to continue to make infringing reproductions of photographs; the Eighth Circuit found that when "a copyright owner has established a threat of continuing infringement, the owner is entitled to an injunction regardless of registration."  23 F.3d at 1349.  Defendants here have admitted, through their comments to *Press Gazette*, that they plan to continue infringing:  their past infringement coupled with admitted intent to commit future infringement, should entitle plaintiffs to an injunction against future use of works that cannot yet be registered.

Plaintiffs seek a temporary restraining order and preliminary injunction enjoining and restraining defendants from reproducing, hosting, distributing and displaying the infringing content to users in the United States, and from inducing those domestic users to upload domestically copyright protected content and/or to post, share, and archive that content on the Infringing Website. As set forth in the accompanying Koonce Decl., plaintiffs are seeking independent but complementary relief from the courts in Canada, where defendants may be copying and uploading the content (the precise parameters of where defendants are doing what, at what times, and with what servers and hosts, will need to be explored in discovery and, if appropriate, plaintiffs reserve the right to seek broader injunctive relief upon discovery of information justifying same).  In a nutshell, plaintiffs ask this Court to shut down the functionality of this Infringing Website with respect to their copyrighted content – whether or not currently registered – in the United States.

## **CONCLUSION**

For the foregoing reasons and as set forth in the accompanying declarations, plaintiffs' application for a temporary restraining order and preliminary injunction should be granted in its entirety.

Dated: New York, New York
      August 26, 2008

                           Respectfully submitted,

                           DAVIS WRIGHT TREMAINE LLP

                           By:_____
                              Robert D. Balin (RDB 5847)
                              Lacy H. Koonce, III (LK 8784)
                              Deborah A. Adler (DA 0909)

                           1633 Broadway
                           New York, New York 10019
                           Tel:    (212) 489-8230
                           Fax:    (212) 489-8340

                           *Attorneys for Plaintiffs*